The Medical College Laboratory of the City of New York, Respondent, *v.* New York University, Appellant.

Equity—Admissibility of Evidence Showing Inducement for a Deed Expressing a Nominal Consideration—Decree Directing Reconveyance Based upon Failure of Consideration. A deed executed by an incorporated medical college conveying property to a university with which the college had merely a nominal connection, reciting a consideration of one dollar and an agreement by the grantee to pay the grantor's debts, if any, expresses a nominal consideration only, where there are no debts, and the statute authorizing the conveyance provided that the rights of any creditors of the grantor should not be thereby impaired, and the resolutions of transfer and acceptance showed that the agreement to pay the debts formed no part of the consideration; in such a case the real consideration may be shown by parol. Evidence, therefore, of negotiations prior to the deed, to the effect that the inducing cause of the conveyance was an oral statement made by a representative of the university having apparent, but not actual, authority, that if the college would turn over all its property to the university the medical committee of the council of the latter should have entire management and control of the college, which should succeed in the appointment of professors to the powers theretofore exercised by the medical faculty, and that the medical committee should always remain constituted of people acceptable to the medical faculty, supplemented by evidence that subsequent to the execution of the deed the university had placed itself in such a position that it could not carry out the agreement whereby it had acquired the property, will support a decree in equity directing its reconveyance.

*Medical College Laboratory* v. *N. Y. University*, 76 App. Div. 48, affirmed.

(Argued February 16, 1904; decided April 5, 1904.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered December 11, 1902, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*David B. Hill* for appellant. No legal or equitable liability was established against the defendant. (11 Am. & Eng.

Ency. of Law [2d ed.], 184 ; *Texas* v. *Hardenberg,* 19 Wall.
[U. S.] 89 ; *Craig* v. *Leslie,* 3 Wheat. [U. S.] 578 ; *Murray*
v. *De Rottenham,* 6 Johns. Ch. 52 ; *Noyes* v. *Blakeman,* 6
N. Y. 567 ; *New* v. *Nichol,* 73 N. Y. 127 ; *People ex rel.* v.
*Feitner,* 168 N. Y. 441.) There is no material and substan-
tial evidence sustaining the essential proposition necessary to
be maintained by the plaintiff, to wit, that the oral " promises "
alleged in the complaint were actually made. (*Lopez* v.
*Campbell,* 163 N. Y. 348 ; *Pollock* v. *Pollock,* 71 N. Y. 153 ;
*Jewell* v. *Poor,* 13 C. B. 916 ; *Baulic* v. *N. Y. & H. R.
Co.,* 59 N. Y. 366 ; *Bulger* v. *Rosa,* 119 N. Y. 464 ; *Bagley*
v. *Bowe,* 115 N. Y. 180 ; *Matter of Harriott,* 145 N. Y. 545 ;
*Linkhauff* v. *Lombard,* 137 N. Y. 425.) The official resolu-
tions of the contracting corporations, and the indenture of
February 8, 1897, executed and delivered in accordance
therewith, must be deemed to control the rights and
obligations of the parties ; and parol evidence was not
admissible to contradict, enlarge or vary their terms and
provisions. (*Stowell* v. *G. Ins. Co.,* 163 N. Y. 298 ; *Thomas*
v. *Scutt,* 127 N. Y. 133 ; *Brantingham* v. *Huff,* 174
N. Y. 53 ; *Mahany* v. *Carr,* 175 N. Y. 454 ; *Mead* v. *Dun-
levie,* 174 N. Y. 108 ; *Dady* v. *O'Rourke,* 172 N. Y. 447 ;
*J. B. C. Assn.* v. *Allen,* 172 N. Y. 291 ; *Eighmie* v. *Taylor,*
98 N. E. Rep. 288 ; *Trustees of Southampton* v. *Jessup,* 173
N. Y. 84 ; *Hall* v. *Boston,* 26 App. Div. 105.) The alleged
agreement was illegal and void. (*Thompson* v. *Schermer-
horn,* 6 N. Y. 92 ; *Birdsall* v. *Clark,* 73 N. Y. 73 ; *Phelps*
v. *Mayor, etc.,* 112 N. Y. 216, 219, 220 ; *People ex rel.* v.
*Willis,* 9 App. Div. 214 ; *West* v. *Camden,* 135 U. S. 507 ;
*Mills* v. *Mills,* 40 N. Y. 543 ; *S. Bank* v. *King,* 44 N. Y.
87 ; *Bliss* v. *Matteson,* 45 N. Y. 22 ; *Fennessy* v. *Ross,* 90
Hun, 298 ; *Kountze* v. *Flannagan,* 46 N. Y. S. R. 471.) A
refusal to make good Mr. Dimock's alleged promises does not
entitle plaintiff to a reconveyance of the property. (*Staples*
v. *Gould,* 9 N. Y. 520 ; *Peck* v. *Burr,* 10 N. Y. 294 ;
*S. Bank* v. *King,* 44 N. Y. 87 ; *Arnot* v. *Pittston & Co.,*
68 N. Y. 558 ; *Knowlton* v. *Congress Co.,* 57 N. Y. 518 ;

*Nellis* v. *Clark,* 4 Hill, 424; *Higgins* v. *McCrea,* 116 U. S. 671; *Tallmage* v. *Pell,* 7 N. Y. 328; *Tracy* v. *Talmage,* 14 N. Y. 162; *Ernst* v. *Crosby,* 140 N. Y. 364.)

*Elihu Root, Bronson Winthrop* and *Henry L. Stimson* for respondent.   That the representatives of the defendant made certain specific promises to the plaintiff to induce it to transfer its property to the defendant was abundantly sustained by the evidence.   (*Stitt* v. *Huidekopers,* 17 Wall. 384; *Gorham* v. *Payton,* 3 Ill. 363; *Matthews* v. *Poythress,* 4 Ga. 287; *Gibbons* v. *Potter,* 30 N. J. Eq. 204; 29 Am. & Eng. Ency. of Law, 778.)   The defendant having repudiated the promise of its agents, the plaintiff is entitled to have its property reconveyed to it.   (1 Perry on Trusts, § 171; *Rackemann* v. *R. I. Co.,* 167 Mass. 1; *Krumm* v. *Beach,* 96 N. Y. 406; *Eberts* v. *Selover,* 44 Mich. 519; *Kennedy* v. *McKay,* 14 Vroom, 290; *Titus* v. *C. R. R. Co.,* 17 Vroom, 420; *Knappen* v. *Freeman,* 47 Minn. 495; *Perkins* v. *Boothby,* 71 Me. 91; *Udell* v. *Atherton,* 7 H. & N. 172; *Brady* v. *Todd,* 9 C. B. [N. S.] 596.)   Assuming the promises were in fact authorized by the defendant, then the plaintiff is entitled to have its property reconveyed if the promises are void and unenforceable. (*Reed* v. *McConnell,* 133 N. Y. 435; *Day* v. *N. Y. C. R. R. Co.,* 51 N. Y. 583; *Peck* v. *Hoyt,* 39 Conn. 9; *Penfield* v. *Penfield,* 41 Conn. 474; *Randall* v. *Constans,* 33 Minn. 329; *Peacock* v. *Nelson,* 50 Mo. 256; *Dix* v. *Marcy,* 116 Mass. 416; *Miller* v. *Roberts,* 169 Mass. 134; *Basford* v. *Pearson,* 9 Allen, 387; *Root* v. *Burt,* 118 Mass. 521; *O'Grady* v. *O'Grady,* 162 Mass. 290.)   The plaintiff's remedy is the reconveyance of the land.   (*Weaver* v. *Bentley,* 1 Caines, 47; *Dubois* v. *D. & H. C. Co.,* 4 Wend. 285; *Briggs* v. *Vanderbilt,* 19 Barb. 222; *Meade* v. *St. L. M. L. Ins. Co.,* 51 How. Pr. 1; *Freer* v. *Denton,* 61 N. Y. 492; *Michel* v. *Hallheimer,* 56 Hun, 416; *Butler* v. *Dinan,* 19 N. Y. Supp. 950; 139 N. Y. 613; *Koerner* v. *Henn,* 8 App. Div. 602; *Miner* v. *Hilton,* 15 App. Div. 55; *Boyes* v. *G. M. I. Co.,* 33 Pac. Rep. 77.)   No rule of law prevents the plaintiff from

proving the foregoing facts. The case does not fall within the parol evidence rule. Plaintiff is not attempting to vary a written contract. (*A. College* v. *Ritch*, 151 N. Y. 282; *Ahrens* v. *Jones*, 169 N. Y. 555; *McClellan* v. *Grant*, 83 App. Div. 599; *Goldsmith* v. *Goldsmith*, 145 N. Y. 313; *Lamb* v. *Lamb*, 18 App. Div. 250; *Moyer* v. *Moyer*, 21 Hun, 67; *Brison* v. *Brison*, 75 Cal. 533; *Lawrence* v. *Sullivan*, 79 App. Div. 453; *S. F. Co.* v. *W. School District*, 130 Penn. St. 76; *Lippincott* v. *Whitman*, 83 Penn. St. 244.)

PARKER, Ch. J.   The judgment under review requires the reconveyance to plaintiff of property it conveyed to defendant by a deed dated February 8, 1897, which recites a consideration of one dollar, and contains an assumption of debts, if any, by the grantee. But the property, which was worth about $150,000, was unincumbered, and plaintiff was not indebted to any one. Defendant paid nothing for the property; and the ground upon which the decree of reconveyance is rested is that certain promises made to the officers and directors of plaintiff by representatives of defendant were not kept — indeed, that such promises were repudiated by defendant — and as plaintiff would not have made the conveyance but for them, it is entitled to have the property restored to it.

About ten years after the creation of defendant a number of physicians of prominence associated, and established a medical school in connection with the university in pursuance of the following university statutes:

" I. All expenses for building, apparatus, museum, etc., are to be provided for by the Medical Faculty and the Council shall be in no ways responsible for expenses incurred by the Medical Faculty.

" II. Each graduate shall pay to the Treasury of the University $20, $10 of which shall be given to the Chancellor for each diploma furnished by him, and this shall be the only tax required by the Council from the students or Faculty.

" III. Nominations to fill vacancies and to establish new Professorships shall come from the Faculty to the Council.

"IV. The Faculty shall have power to make any by-laws for their own government and that of the students, which shall be compatible with the character and general statutes of the University to regulate the terms of instruction and the fees from students, and to recommend students for diplomas."

At the following meeting of the university council a change was made providing that the medical faculty should make nominations to fill vacancies in their number, and that the council with concurrence of the faculty might prescribe the requisite qualifications of medical students. It will be seen that the faculty was to govern the medical school and to assume all financial responsibility; vacancies in the medical faculty were to be filled by the council, but only on the nomination of the faculty; and defendant was to issue diplomas, receiving a fee of $20. Practically, therefore, the medical faculty organized a college nominally connected with the university, but in effect a self-governing, independent, proprietary school.

The school prospered and in 1843 the faculty purchased a building, and put it in order at an expense of $60,000. Their museum and apparatus were valued at $30,000. Other property was bought and improvements made, and after 1882 a college building was erected on land purchased by the faculty, who held title as tenants in common. Some of the faculty had made presents of substantial value to the college. Others had advanced moneys, receiving certificates showing the amount advanced, which it was expected would be returned. Friends of the faculty had made substantial contributions.

In 1883, chapter 125 of the laws of that year was enacted, incorporating the Medical College Laboratory of the City of New York, this plaintiff. The eight members of the faculty were made incorporators by the act, which directed that they should constitute the first board of directors, which should be self-perpetuating. To this corporation the faculty conveyed the real estate.

Some years later an attempt was made to strengthen the college by bringing into the board of directors three laymen

— D. Willis James, Charles E. Miller and Francis L. Stetson — three incorporators resigning for that purpose. The corporation was still under the control of the medical faculty, however, as they composed a majority of the board.

The school continued to prosper and in 1891 Col. Oliver H. Payne — a friend of the doctors composing the faculty, and very much interested in their work — gave them a sum sufficient to discharge the mortgage debts upon the property, and to pay the certificates (*supra*) issued for moneys loaned prior to the incorporation.

At the time, therefore, that the negotiations commenced about which we are to speak, plaintiff owned a large property, free from debt, and was conducting a medical school which, so far as its management and government were concerned, was apparently an independent institution, but called a department of the New York University. Defendant was able to show that $1,000 was received by the medical school through university sources, but with that exception all the money seems to have been given or raised by the directors of plaintiff.

There were negotiations looking to a transfer of the property to the university in 1876 and in 1886. But we need not give the details. They were of importance to the trial court and the Appellate Division as tending to show whether plaintiff and defendant stood in the position of bargainors prior to negotiations in issue here, and hence of value in passing upon the character of the later negotiations. But that evidence is not specially helpful to this court, which is confined to the inquiry whether there is evidence tending to establish the making of promises which led to the conveyance and its subsequent breach.

In the latter part of 1896 Dr. Stimson, of plaintiff's medical faculty, spoke to the chancellor of the university about the removal of one of the professors. The latter suggested that the better, if not the only way, was for the medical college to surrender its property to the university, and place itself under the management of the university council. It seems that the

medical committee of the council — the only part of the council aside from the chancellor that had had anything to do with the affairs of the medical college — had not once met during the administration of the then chancellor, a period of upwards of ten years. This non-action was accredited to the fact that the medical college had maintained practically an independent status. The desirability of interesting the medical committee was considered. The chancellor suggested the filling of two vacancies with friends of the medical college, so that in case of the transfer of the property the medical committee could control and direct the medical college, and that the faculty select two men to be elected to the council with that end in view. The faculty did suggest Henry F. Dimock and Charles E. Miller, then a director of plaintiff.

The chancellor does not agree with Dr. Stimson that he said the medical committee should control and direct the medical college. It is not of moment whether he made so broad a statement, for plaintiff's claim does not rest on that promise.

They agree, however, that they were trying to evolve a plan by which the medical committee should be so composed as to be satisfactory to plaintiff, thus bringing about closer relations between the university and the medical college. Whatever the details of the negotiations, they resulted in the election of Dimock and Miller to the medical committee, the former being made chairman. The other members were Col. Oliver H. Payne and Charles T. Barney, with the chancellor *ex officio*.

A little more than a month after the election of Dimock and Miller, Dr. Pardee, the dean of the medical college and a director and the secretary of the corporation, received from the chancellor a letter inclosing this resolution of the executive committee of the university: "*Resolved*, That the New York University by its executive committee invites the University Medical Laboratory Corporation and the Loomis Laboratory Corporation to confer with a sub-committe consisting of Mr. Henry F. Dimock and the chancellor of the

university respecting the expediency of the transfers thus recommended." This resolution, it will be seen, advised plaintiff that Mr. Dimock and the chancellor had authority to represent defendant in such negotiations. Plaintiff contends that it was led to convey its property upon the faith of promises made by these representatives of defendant; that such promises were not kept; and that defendant has placed itself where it is impossible for it to keep them. Thus arises its claim — sustained by the courts below — that it is entitled in equity to a reconveyance of the property.

After receiving the letter and resolution Dr. Pardee sent to each member of plaintiff's board of directors copies of them, and called a meeting of the board for the 19th of December. A majority of the board assembled and Mr. Dimock appeared, according to the terms of the resolution of the executive committee of the defendant, as its accredited representative.

It was at this meeting, called under these circumstances, that the promises were made, if at all, which plaintiff's directors insist led it to convey the property. Plaintiff claims that it was promised that if it would turn over all its property to the university, the medical committee of the council of the university should have entire management and control of the affairs of the medical college, which should succeed in the appointment of professors to the power theretofore exercised by the medical faculty, and that the medical committee should always remain constituted of people acceptable to the medical faculty, and that such result should be accomplished by the election of members to the university council who were agreeable to the medical faculty.

Now our first inquiry is, Is there evidence tending to support the claim of plaintiff that such promises were made by the representatives of defendant? Dimock's testimony as to what occurred at this meeting is: "I said to these gentlemen that I had come, together with the chancellor, as a committee from the university to lay before them some of the reasons why we thought it would be well for them to pass that prop-

erty over to us, and to state some of the conditions on which we were willing to receive it. I explained to them — I told them I supposed they knew, of course, that this medical committee, called the medical committee of the university, had been reconstituted, as I understood, in accordance with their wishes, and that it consisted of Colonel Payne, Mr. Miller, Mr. Barney, myself — and I was the chairman — and the chancellor *ex officio*. I explained to them — what I supposed they knew — that that was a very friendly committee to them, and, as I understood, two of the members, Mr. Miller and myself, had been elected to the council at their suggestion, to be placed on the committee, and that, of course, Colonel Payne was the great benefactor of their institution. I said to them that if they passed their property over to the university, the university would engage that that committee, the medical committee, should always remain constituted of people who were acceptable and satisfactory to the governing faculty; that as vacancies occurred, members of the council who were agreeable or acceptable to them would be appointed to the place, and that that committee, so constituted, would have and should have the entire management and control of the property to be turned over, and of the affairs of the medical college, and that it should succeed, in the appointment of professors, to the power that had been exercised by the governing faculty theretofore. I explained to them that these things would be done if the property was turned over."

In this testimony of Dimock is to be found every element of the promise upon which plaintiff relies. There is the assurance that the reorganization of the medical committee was for the express purpose of so constituting the committee as that it should be absolutely satisfactory to the medical faculty, in that it should assure to that faculty that practical control of the institution which they and their predecessors had had for the something more than half a century of its existence, and which had built for it a substantial reputation as an educator in the field of medicine, a reputation in which the faculty, as well as their predecessors, took a just pride.

11

This testimony of Dimock shows that the medical committee was not made satisfactory to the medical college for a temporary purpose merely, but that it was to continue to the end satisfactory to the medical faculty, and the assurance of its continuance was in the promise that the medical committee should always remain constituted of people acceptable and satisfactory to the medical faculty, and that such committee was to have the entire control and management of the property.

We need not further analyze Dimock's testimony, for we have seen that it was broad enough to cover the claim of plaintiff that defendant through its representatives promised in substance that the medical faculty should continue to be the leading factor in the conduct of the medical college.

Dimock's testimony is corroborated by several, if not all of, plaintiff's directors present on the day Dimock made the statement referred to to the board. It is contradicted by the chancellor in so far as the alleged promises of Dimock in behalf of defendant were concerned. The latter is quite confident no promises were made. But it is not for us to weigh the testimony. That duty devolved upon the Special Term and the Appellate Division, to which the Constitution gives the right to review evidence. This court is limited to the inquiry whether there is evidence to support the determination of the court. Now, as we have seen, such evidence is to be found in the testimony of Dimock, and hence we need not examine the evidence further on this subject.

But, says defendant, the committee had no authority to make any such promises, and defendant should not be held bound by representations made by agents in excess of the authority conferred. But the answer is that defendant conferred upon Dimock and the chancellor the *apparent* authority to make all the representations made when it formally invited the representatives of plaintiff to confer with these gentlemen touching the transfer. Representations and promises made by Dimock and the chancellor under such circumstances plaintiff had the right to rely upon as being made with the

consent and approval of defendant.  Plaintiff conveyed the property on the strength of the promises, and equity will compel a reconveyance if defendant either will not or cannot make good the promises.

The same principle controls this situation as was applied in *Rackemann* v. *Riverbank Improvement Co.* (167 Mass. 1). In that case an agent of B with authority to sell lots promised A that if he would buy a lot at a certain price B would not sell any other lots on a certain plan at a less price.  Relying upon that promise A purchased the lot.  Within a year B sold two lots at a less price.  A filed a bill in equity for a rescission of the purchase.  Defendant repudiated as unauthorized the contract of its agent.  Plaintiffs insisted that having relied upon the promise they were entitled to rescission.  The court was of that opinion.  It said : " The defendant would not have secured the advantage of the sale to the plaintiffs except for the offer and promise of its agent.  The defendant employed him to offer its land for sale.  He made the offer of a lot to the plaintiffs accompanied by the promise which has been mentioned.  The plaintiffs agreed to take the land with the promise.  It turns out that they got the land without the promise.  The defendant cannot retain what is beneficial in the transaction, while disclaiming what is onerous.  When it repudiates the means by which plaintiffs were brought to contract with it, this entitles the plaintiffs to give up the contract altogether, unless there is some other objection to their doing so.  The rule in this respect is the same, whether the unauthorized act of the agent was fraudulent, or merely matter of warranty or promise."

In that case, as in this, the promise was oral, made without authority, and was the inducing cause of the contract.  We are agreed that *Rackemann's* case is authority here.  This judgment, therefore, is supported by the evidence provided defendant has placed itself where it cannot possibly make good the promises made to plaintiff by its representatives.

It was found at Special Term that by reason of defendant's acts since the conveyance, and for other reasons, it is not pos-

sible that the property should be employed and used for and in accordance with the promise and agreement under which defendant acquired it.   Our next inquiry must be whether there is some evidence to support that finding.

The deed, as we have noted, was executed February 8, 1897, and accepted by the council of defendant on the first of March following.   Eighteen days later negotiations were formally commenced by the executive committee of the council for the consolidation of plaintiff with the Bellevue Hospital Medical College.   By the 12th of April the negotiations gave such assurance of success that the medical committee of defendant adopted a resolution calling for the resignations of eight members of the medical faculty as one step toward consolidation.   The resignations were promptly tendered.   May 3d the medical committee reported the university statutes regulating the performance of the duties of the faculty and appointing the officers and professors of the faculty.   This report was adopted.

On May 24th, however, the council received a protest from the former faculty of the Bellevue Hospital Medical College against the action taken by the medical committee.   The council reconsidered the report of the medical committee.   A substituted report was drafted which stripped the medical committee of the power it supposed it possessed, and left the former medical faculty of plaintiff in the minority in the governing faculty of the new, or consolidated, college.   The original report and the substitute were referred to the medical committee.   That committee then presented a compromise report acceptable to the old faculty, but not satisfactory to the council of defendant, which so amended it as to render it unacceptable to the faculty.   Efforts were made by the members of the former medical faculty to bring about an abandonment of the plan of consolidation.   A hearing was had June 9, 1897, in which all of the professors of plaintiff and some from the Bellevue Hospital Medical College appeared, and favored abandonment of the plan of consolidation.   Two days later the executive committee adopted resolutions approving

the plan.  Thereupon consolidation of the two colleges, so far as defendant could accomplish it, was effected.

The various steps in the total estrangement of those persons representing plaintiff and defendant — such as the refusal of the former members of the medical faculty to accept chairs offered to them, the tender of such chairs and their acceptance by others who were strangers to the college and its work, the annual election of members of the council at which there was a refusal to elect Mr. Dimock a member of the medical committee, followed by an immediate tender of the resignations of Messrs. Payne, Barney and Miller — followed each other in rapid succession.  The mere recital of these events make their own comment, and, supplementing the action of the executive committee in consolidating the two colleges, demonstrate that there is evidence to support the determination of the learned trial judge that a situation has arisen which makes it impossible that the property should be employed and used in accordance with the promises made to plaintiff, and under which defendant acquired title.  A decree, therefore, directing a reconveyance furnishes the method by which equity could more nearly than by any other work out justice between the parties.

Defendant insists that this oral testimony touching the negotiations prior to the deed should not have been received. It was seasonably and properly objected to, and if defendant is right in its contention the judgment cannot stand.  The deed recites that it was given " In consideration of the sum of one dollar paid by the party of the second part, and of the agreement herein made by the party of the second part to assume and pay the debts and obligations of the party of the first part if any there be."  If the recital had stopped with the assertion that the deed was given in consideration of the sum of one dollar, there could be no question of the right of plaintiff to prove by parol the real consideration.  It is always open to a party where a nominal consideration is expressed to show what the real consideration was, and to compel performance by the grantee in case he has refused to

keep the promise or do the thing which constituted the actual consideration. In this case, however, the recital does not stop with the acknowledgment of the nominal consideration, but continues with the statement of an agreement made by the party of the second part to assume and pay the debts and obligations of the party of the first part, if any.

Now that agreement on its face expresses a good consideration and hence defendant insists that evidence may not be introduced to contradict it, and to show that in addition to an agreement to pay the debts defendant agreed to do something else. But plaintiff contends that this recital should not be given the weight which would ordinarily attend it between individuals for the reason that the act of 1892 which authorized the conveyance provided that "the rights of any creditor of the said the Medical College Laboratory of the City of New York shall not be thereby impaired," and hence it is said that if there were any debts they were as much of a charge upon the land as if such an amount was secured by mortgage, and, therefore, their payment by the grantee — if it would keep the property — was in effect required by the statute independently of the agreement stated in the deed; that the recital of the agreement in the deed was, therefore, unnecessary and without force, for such would have been the obligation of defendant taking title pursuant to the statute even though there had been no such recital.

Plaintiff also urges that it is alleged in the complaint and admitted in the answer that there were no debts, so that defendant assumed no burden whatever in taking the deed, and that such fact is of importance in that it tends strongly to establish the claim of plaintiff that the recital was inserted in accordance with that which was understood to be in effect the command of the statute rather than as part of the agreement between the parties, both of which understood there were no debts.

Several answers are attempted to be made to this argument, but the most serious one is that an attack upon the deed is necessary in order to reduce this recital to an expression with-

out force or value, as the parties perhaps understood it to be. While this is so, the evidence which reduces its value to nothing was properly before the court. That there were no debts was established by the pleadings, while the statute, the resolution of plaintiff corporation directing the conveyance and the insertion therein of this provision, and the evidence of acceptance by defendant, were all read in evidence without objection. That being so, the fact was established that the agreement to pay the debts did not form any part of the consideration, and the situation presented was one where the court was at liberty to treat the deed as if it did not contain such a recital, and instead stated merely a consideration of one dollar. In such case oral evidence is permissible to show the inducement for the deed — the promise which led to its making — and the failure of defendant to make good the promise appearing to be made upon its authority and upon which plaintiff relied.

As we think the oral evidence was admissible under the peculiar circumstances to which we have referred, it follows that the judgment must be affirmed, with costs.

GRAY, MARTIN, VANN, CULLEN and WERNER, JJ., concur; HAIGHT, J., absent.

Judgment affirmed.